Nos. 12-2477 & 12-2556

_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

_____

VICKY T. BENNETT,

Plaintiff-Appellee,

v.

CSX TRANSPORTATION, INCORPORATED,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Eastern District of North Carolina
in Case No. 5:10-cv-00493-BO (Boyle, J.)

_____

**OPENING BRIEF OF DEFENDANT-APPELLANT**
**CSX TRANSPORTATION, INCORPORATED**

_____

Scott S. Cairns
MCGUIRE WOODS LLP
Bank of America Tower
50 North Street,
    Suite 3300
Jacksonville, FL 32202
(904) 798-3323

John C. Millberg
Meredith E. Woods
MILLBERG GORDON
    STEWART PLLC
1101 Haynes Street,
    Suite 104
Raleigh, NC 27604
(919) 836-0090

Evan M. Tager
Miriam R. Nemetz
Scott M. Noveck
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000

*Counsel for Defendant-Appellant*
*CSX Transportation, Incorporated*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS**

No.  12-2477 / 12-2556    Caption:  Vicky T. Bennett v. CSX Transportation, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

 CSX Transportation, Inc.   who is  appellant   makes the following disclosure:

1.      Is party/amicus a publicly held corporation or other publicly held entity?
☐YES ☒NO

2.      Does party/amicus have any parent corporations?      ☒YES ☐NO

        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:  CSX Corporation (parent company)

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☒YES ☐NO

        If yes, identify all such owners:  CSX Corporation

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
☐YES ☒NO

        If yes, identify entity and nature of interest:  N/A

5.      Is party a trade association? (amici curiae do not complete this question)
☐YES ☒NO

        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:  N/A

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☒NO

        If yes, identify any trustee and the members of any creditors' committee:
         N/A

Signature:  /s/ Miriam R. Nemetz              Date:  April 26, 2013

Counsel for:  CSX Transportation, Inc.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ............................................................. v

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES ..............................................................1

STATEMENT OF THE CASE .........................................................3

STATEMENT OF FACTS ...............................................................4

    A.    Bennett's Employment At CSXT ...........................................4

        1.    The alleged conflict over Bennett's work schedule ........4

        2.    Directions to the Fayetteville yard ...........................6

        3.    Vandalism of Bennett's vehicle .................................8

    B.    Bennett's Departure From CSXT ......................................11

    C.    Trial Proceedings ........................................................12

        1.    William Darity's testimony .........................................12

        2.    Testimony concerning lost income ............................13

        3.    CSXT's excluded evidence .......................................16

        4.    Jury charge and verdict ............................................18

    D.    Post-Trial Proceedings .........................................20

SUMMARY OF ARGUMENT ......................................................20

STANDARD OF REVIEW .........................................................25

ARGUMENT .............................................................................26

I.    THE EVIDENCE IS INSUFFICIENT TO SUPPORT LIABILITY UNDER TITLE VII. .............................................26

    A.    There Was No Evidence That James Gilbert Or Ed Howze Vandalized Bennett's Vehicle .................................28

    B.    The Remaining Incidents Identified By Bennett Cannot Sustain Liability On A Title VII Hostile-Environment Claim ......................................................................33

# TABLE OF CONTENTS
## (continued)

Page

II.   THE DISTRICT COURT'S ERRONEOUS EVIDENTIARY
      RULINGS NECESSITATE A NEW TRIAL.................................37

      A.   The District Court Erroneously Excluded Evidence
           Indicating That The Vandalism Was Committed By
           Someone Other Than A CSXT Supervisor.........................37

      B.   The District Court Erred In Admitting The Testimony
           Of William Darity.....................................................44

           1.   Darity's opinions were inadmissible under Rules
                702 and 403. ...................................................44

           2.   Darity's testimony was inadmissible under Rule
                703 and *Daubert.*............................................48

III.  THE DISTRICT COURT ERRED IN AWARDING FRONT
      AND BACK PAY............................................................50

      A.   Bennett Is Not Eligible For Front Or Back Pay Because
           She Neither Sought Nor Obtained A Finding Of
           Constructive Discharge. ..........................................50

           1.   Bennett is not eligible for front or back pay
                absent a finding of constructive discharge. ................51

           2.   Bennett did not seek or obtain a finding of
                constructive discharge...........................................56

      B.   The Awards Of Front And Back Pay Are Excessive............59

           1.   The district court exceeded its discretion in
                awarding twenty-seven years of front pay at full
                salary. ...........................................................59

                a.   The front-pay award is legally excessive...........59

                b.   The front-pay award is unsupported by, and
                     directly contrary to, the evidence at trial..........61

           2.   The district court miscalculated the amount of
                back pay.........................................................64

## TABLE OF CONTENTS
### (continued)

**Page**

a.    Bennett is not entitled to back pay for loss of personal services. ...............................64

b.    Bennett is not entitled to back pay for the time her training class was furloughed. .............65

c.    The back-pay award must be reduced to account for Bennett's ability to earn mitigating income in 2011 and 2012..................66

IV.   THE AWARDS OF ATTORNEYS' FEES AND COSTS SHOULD BE VACATED.................................67

CONCLUSION ....................................................69

REQUEST FOR ORAL ARGUMENT .....................................69

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)......71

CERTIFICATE OF SERVICE..................................................72

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adalman v. Baker, Watts & Co.,*
   807 F.2d 359 (4th Cir. 1986) ............................................................44

*Adams v. City of Chicago,*
   706 F. Supp. 2d 863 (N.D. Ill. 2010) ...............................................36

*Alicea Rosado v. Garcia Santiago,*
   562 F.2d 114 (1st Cir. 1977)...............................................50, 57, 58

*Am. Bankers Ins. Grp., Inc. v. Long,*
   453 F.3d 623 (4th Cir. 2006) ............................................................26

*Anderson v. Russell,*
   247 F.3d 125 (4th Cir. 2000) ............................................................25

*Banks v. United Parcel Servs., Inc.,*
   2005 WL 2436725 (W.D. Tenn. 2005)...............................................32

*Barfield v. Orange Cnty.,*
   911 F.2d 644 (11th Cir. 1990) ..........................................................47

*Bass v. E.I. DuPont de Nemours & Co.,*
   324 F.3d 761 (4th Cir. 2003) ............................................................34

*Beale v. Hardy,*
   769 F.2d 213 (4th Cir. 1985) ............................................................29

*Blackburn v. Martin,*
   982 F.2d 125 (4th Cir. 1992) ............................................................66

*Bonds v. Leavitt,*
   629 F.3d 369 (4th Cir. 2011) ...............................................27, 34, 35

*Brady v. Allstate Ins. Co.,*
   683 F.2d 86 (4th Cir. 1982) ..........................................................4, 25

*Brady v. Thurston Motor Lines,*
   753 F.2d 1269 (4th Cir. 1985) ..........................................................51

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Brooks v. CBS Radio, Inc.*,
   342 F. App'x 771 (3d Cir. 2009) ........................................36

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998) ..........................................................32

*Burnett v. Tyco Corp.*,
   203 F.3d 980 (6th Cir. 2000) ...........................................36

*Causey v. Balog*,
   162 F.3d 795 (4th Cir. 1998) ...........................................35

*Chapin v. Fort-Rohr Motors, Inc.*,
   621 F.3d 673 (7th Cir. 2010) ...........................................52

*Clark v. Marsh*,
   665 F.2d 1168 (D.C. Cir. 1981) ........................................52

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ...................................................*passim*

*DeJarnette v. Corning Inc.*,
   133 F.3d 293 (4th Cir. 1998) ...........................................25

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
   290 F.3d 639 (4th Cir. 2002) ......................................53, 54

*Derr v. Gulf Oil Corp.*,
   796 F.2d 340 (10th Cir. 1986) .........................................52

*Dial v. Travelers Indem. Co.*,
   780 F.2d 520 (5th Cir. 1986) ......................................40, 42

*Disher v. Fast Fare, Inc.*,
   898 F.2d 144 (table), 1990 WL 29208 (4th Cir. 1990) (per curiam)...31

*Dotson v. Pfizer, Inc.*,
   558 F.3d 284 (4th Cir. 2009) ......................................26, 60

vi

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Duke v. Uniroyal Inc.*,
928 F.2d 1413 (4th Cir. 1991) ...............................................26, 59, 64

*EEOC v. HBE Corp.*,
135 F.3d 543 (8th Cir. 1998) ........................................................60, 61

*EEOC v. Sunbelt Rentals, Inc.*,
521 F.3d 306 (4th Cir. 2008) ........................................................33, 34

*Ford Motor Co. v. McDavid*,
259 F.2d 261 (4th Cir. 1958) ........................................................29, 30

*Gibson v. Old Town Trolley Tours of Wash., D.C., Inc.*,
160 F.3d 177 (4th Cir. 1998) ...............................................................28

*Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*,
803 F.2d 250 (6th Cir. 1986) ...............................................................52

*Hammann v. Hartford Accident & Indem. Co.*,
620 F.2d 588 (6th Cir. 1980) ...............................................................42

*Hartsell v. Duplex Prods., Inc.*,
123 F.3d 766 (4th Cir. 1997) ...............................................................35

*Hawkins v. PepsiCo, Inc.*,
203 F.3d 274 (4th Cir. 2000) ...............................................................34

*Hertzberg v. SRAM Corp.*,
261 F.3d 651 (7th Cir. 2001) ........................................................52, 58

*Johnson v. Shalala*,
991 F.2d 126 (4th Cir. 1993) ...............................................51, 52, 54

*Jurgens v. EEOC*,
903 F.2d 386 (5th Cir. 1990) ........................................................52, 55

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ...............................................................................48

vii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Lipsett v. Univ. of P.R.,*
  740 F. Supp. 921 (D.P.R. 1990)........................................................47

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,*
  387 F. Supp. 2d 794 (N.D. Ill. 2005)..................................................48

*Lovelace v. Sherwin-Williams Co.,*
  681 F.2d 230 (4th Cir. 1982).................................................29, 30, 31

*Maney v. Brinkley Mun. Waterworks & Sewer Dep't (Ark.),*
  802 F.2d 1073 (8th Cir. 1986)............................................................52

*Marrero v. Goya of P.R., Inc.,*
  304 F.3d 7, 28 (1st Cir. 2002)............................................................57

*Nichols v. Ashland Hosp. Corp.,*
  251 F.3d 496 (4th Cir. 2001).................................................26, 59, 61

*Ocheltree v. Scollon Prods., Inc.,*
  335 F.3d 325 (4th Cir. 2003) (en banc)............................................27

*Oglesby v. Ford Motor Co.,*
  2005 WL 1993434 (E.D. Va. 2005).....................................................30

*Oglesby v. Gen. Motors Corp.,*
  190 F.3d 244 (4th Cir. 1999)..............................................................49

*Parkins v. Civil Constructors of Ill., Inc.,*
  163 F.3d 1027 (7th Cir. 1998).............................................................28

*Peyton v. DiMario,*
  287 F.3d 1121 (D.C. Cir. 2002).........................................................61

*Rogers v. Allstate Ins. Co.,*
  47 F. App'x 797 (8th Cir. 2002) (per curiam).....................................42

*Satterwhite v. Smith,*
  744 F.2d 1380 (9th Cir. 1984).............................................................52

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Sloas v. CSX Transp., Inc.,*
  616 F.3d 380 (4th Cir. 2010) .............................................................66

*Spagnuolo v. Whirlpool Corp.,*
  641 F.2d 1109 (4th Cir. 1981) ..........................................................53

*Spencer v. Wal-Mart Stores, Inc.,*
  469 F.3d 311 (3d Cir. 2006).........................................................52, 57

*Taylor v. Home Ins. Co.,*
  777 F.2d 849 (4th Cir. 1985) ...........................................................65

*Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.,*
  57 F.3d 1317 (4th Cir. 1995) ...........................................................29

*United States v. Aramony,*
  88 F.3d 1369 (4th Cir. 1996) ...........................................................43

*United States v. Cecil,*
  836 F.2d 1431 (4th Cir. 1988) ..........................................................45

*United States v. Chapman,*
  209 F. App'x 253 (4th Cir. 2006)..................................................45, 46

*United States v. Leftenant,*
  341 F.3d 338 (4th Cir. 2003) ...........................................................41

*United States v. McIver,*
  470 F.3d 550 (4th Cir. 2006) .......................................................44, 45

*United States v. Wilson,*
  133 F.3d 251 (4th Cir. 1997) ...........................................................45

*United States v. York,*
  933 F.2d 1343 (7th Cir. 1991) .....................................................40, 42

*Vance v. Ball State Univ.,*
  No. 11-556 (U.S. argued Nov. 26, 2012) ...........................................28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Wells v. N.C. Bd. of Alcohol Control,*
714 F.2d 340 (4th Cir. 1983) .................................................55, 56

*Westberry v. Gislaved Gummi AB,*
178 F.3d 257 (4th Cir. 1999) .................................................25, 26

*Westfield Ins. Co. v. Harris,*
134 F.3d 608 (4th Cir. 1998) ........................................ 39, 40, 42, 43

*Whitten v. Fred's, Inc.,*
601 F.3d 231 (4th Cir. 2010) ............................................................28

*Williams v. Cerberonics, Inc.,*
871 F.2d 452 (4th Cir. 1989) ............................................................29

*Wilson v. Volkswagen of Am., Inc.,*
561 F.2d 494 (4th Cir. 1977) ............................................................26

**Statutes, Regulations, and Rules**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

28 U.S.C. § 1367(a) ..............................................................................1

Title VII of the Civil Rights Act of 1964,
42 U.S.C. §§ 2000e *et seq.*.......................................................*passim*

42 U.S.C. § 2000e-5(g)(1) .................................................................51

42 U.S.C. § 2000e-5(k).......................................................................67

Federal Employers' Liability Act ("FELA"),
45 U.S.C. §§ 51 *et seq.* .............................................................1, 3, 20

49 C.F.R. § 228.19(a)(1)-(2)................................................................5

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Fed. R. Civ. P. 50(a) ................................................................3

Fed. R. Civ. P. 54(d) ..............................................................68

Fed. R. Evid. 401 ...................................................................41

Fed. R. Evid. 403 .............................................................*passim*

Fed. R. Evid. 404 ...................................................................22

Fed. R. Evid. 404(b) ..............................................................41

Fed. R. Evid. 404(b)(1) ..........................................................41

Fed. R. Evid. 404(b)(2) ..............................................18, 22, 42

Fed. R. Evid. 702 .........................................44, 45, 47, 48

Fed. R. Evid. 703 ...............................................23, 48, 49

Fed. R. Evid. 704 ...................................................................45

## JURISDICTIONAL STATEMENT

Plaintiff Vicky Bennett asserted claims under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and state common law. JA26-39. Accordingly, the district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367(a).

The district court entered judgment against defendant CSX Transportation, Inc. ("CSXT") on August 21, 2012 (JA75) and denied CSXT's post-trial motion on December 5, 2012 (JA138-48). CSXT appealed from that judgment on December 13, 2012. Dkt. No. 228. The court entered a separate order awarding attorneys' fees and costs on October 30, 2012 (JA127-37), and CSXT appealed from that order on November 28, 2012 (Dkt. No. 221). This Court has jurisdiction over both appeals under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Bennett, an African-American woman, worked in the field for CSXT as a conductor-trainee during a single week in August 2008. During that week, she experienced friction with two supervisors—with one over her multiple requests for schedule changes, and with the other over her repeated requests for driving directions. At the end of that

1

week, Bennett's car was subjected to racially offensive vandalism in CSXT's parking lot. Neither the police nor CSXT's investigators were ever able to identify the perpetrator or connect the crime to any CSXT employee.

After the incident, Bennett never returned to work at CSXT. She instead filed this lawsuit, contending among other things that CSXT was liable under Title VII for creating a racially and/or sexually hostile work environment. The jury found for Bennett on her Title VII claim and awarded her $150,000 in damages. The court then awarded Bennett back pay from the end of her employment to the time of trial, plus 27 years of front pay at full salary.

The issues presented are:

1.    Whether the evidence was insufficient for the jury to find that CSXT subjected Bennett to a hostile work environment.

2.    Whether the district court erred by (a) excluding evidence tending to show that the vandalism of Bennett's vehicle was committed by someone not associated with CSXT and/or (b) allowing Bennett's supposed expert on race discrimination to offer purely legal conclusions that were based on a methodology that admittedly was not peer-

reviewed and that had not been employed by any other expert in the field.

3.     Whether the district court erred in awarding front pay and back pay to Bennett in the absence of a finding of constructive discharge, and, if not, whether those awards are excessive.

## STATEMENT OF THE CASE

Bennett sued CSXT in the U.S. District Court for the District of South Carolina.  JA26-39.  The case was transferred to the Eastern District of North Carolina.  JA40-47.  After the district court granted CSXT summary judgment on Bennett's common-law claims (JA66), the court conducted a jury trial.

At the close of plaintiff's evidence, CSXT moved under Rule 50(a) for judgment as a matter of law.  JA560-75; Dkt. No. 226.  The district court permitted the case to proceed to the jury on two claims: (1) a FELA negligence claim and (2) a Title VII hostile-environment claim. JA564-65.

The jury returned a verdict for CSXT on the FELA claim, but for Bennett on the Title VII claim, awarding her $150,000 in compensatory damages.  JA68-69.  The district court then awarded Bennett $92,835 in

back pay and $592,869 in front pay.  JA70-74.  It subsequently ordered CSXT to pay $327,423.15 in attorneys' fees and costs to Bennett's trial counsel and $469,528.24 in fees and costs to Bennett's former law firm. JA127-37.

## STATEMENT OF FACTS

### A.    Bennett's Employment At CSXT[1]

CSXT hired Bennett as a conductor-trainee in June 2008.  After a six-week training program, Bennett worked in the field for a single week beginning on August 18.  JA354, 357.  She based her hostile-environment claim on the following three incidents that occurred during that week.

### 1.    The alleged conflict over Bennett's work schedule

Bennett and four other trainees began their field work at CSXT's terminal in Rocky Mount, North Carolina.  JA357-58.  During an orientation class, trainmaster James Gilbert gave the trainees their initial work schedules.  JA262, 357-58.  Bennett correctly identified a problem with her schedule: it would have required her to work a 12-

---

[1]  Taking the evidence in the light most favorable to Bennett (*see, e.g.*, *Brady v. Allstate Ins. Co.*, 683 F.2d 86, 89 (4th Cir. 1982)), the facts recounted here are drawn principally from Bennett's own testimony.

hour afternoon shift in Portsmouth and then immediately drive six hours to begin a morning shift in Florence. JA178-82, 267, 319, 358. That schedule would have violated the federal Hours of Service Act, which requires that railroad workers work no more than 12 consecutive hours and receive 10 hours of rest between shifts, excluding time in transit. *See* 49 C.F.R. § 228.19(a)(1)-(2). Had Bennett attempted to work that schedule, CSXT's personnel management system would not have permitted her to clock in for the second assignment. JA181.

Gilbert immediately corrected Bennett's schedule by swapping her first two assignments—*i.e.*, starting in Florence and then proceeding to Portsmouth.[2] JA261-63, 266, 319-20, 358. Thereafter, Bennett made multiple requests for scheduling changes for her personal convenience. JA324-27, 359-60. Gilbert twice changed Bennett's schedule to accommodate her requests (JA324-25), but he was unable to accommodate Bennett's request that he change her schedule a third time so that she could "get back home" sooner (JA325). According to

---

[2] Bennett contended that the corrected schedule violated the Hours of Service Act, apparently based on a mistaken assumption that the Florence assignment would have been a 12-hour shift. JA358, 529, 552. A CSXT representative explained that the Florence assignment "doesn't work a 12-hour shift" and "it could work as little as one hour." JA266-67; *see also* JA321.

5

Bennett, her conversations with Gilbert about scheduling became "unpleasant[]," especially after she called Lorenzo Wilkins, the manager of conductor training, and asked him to intervene.  JA359-60.  When Wilkins inquired about the dispute with Bennett, Gilbert stated that his "experience with her in the past week has raised serious concerns with her ability to perform at the level this company requires."  JA979. He noted that "[s]he is the only [trainee] who has raised any concerns over their training schedule." *Id.*; *see also* JA328.

## 2.    Directions to the Fayetteville yard

Later that week, Bennett traveled to an assignment in Fayetteville, North Carolina.  Like all new hires, Bennett received written directions to the Fayetteville yard.  JA336-37, 397, 579; *see* JA1007.  At around 8 p.m. the night before her shift, however, Bennett called Ed Howze, the trainmaster in Fayetteville, to ask him for directions.  JA366-67, 580, 1069.

The following morning, while en route, Bennett called Howze several more times to ask for directions.  JA368, 392, 580, 1069.  She first called Howze on his cell phone at 5:50 a.m. and spoke with him for six minutes.  JA395, 582-83, 1069.  Three minutes later, she called

Howze again and spoke with him for another eleven minutes. JA395, 583-84, 1069. Three minutes later, she called Howze yet again. JA395, 586, 1069. Bennett alleges that when she called for the third time, Howze told her to "open your blankin' eyes." JA369. Howze denied using any profanity in his conversations with Bennett. JA586-89; *see also* JA640-41.

Bennett ended the call by abruptly hanging up on Howze. JA369, 586, 588. When Bennett arrived at the yard, Howze drove up and asked her to have a seat in his truck. JA370, 592. Howze then drove with Bennett to her hotel and retraced his directions—which Bennett had written down during their call the previous evening (JA594; *see* JA983)—to confirm that they were correct. JA593-94. On the ride back, Howze disputed Bennett's accusation that he had used profanity earlier. JA371.

Upon returning to the rail yard, Bennett was crying and having trouble "get[ting] [her]self together." JA372. Observing this, Howze decided against making her complete her shift and told her to leave. JA596-97. Bennett testified that Howze told her to "get off my railroad" (JA372) and recalled Howze telling a conductor that Bennett "won't be

working on the railroad today" (JA371). Bennett placed several calls to a law firm that morning. JA400-01, 1069.

### 3. Vandalism of Bennett's vehicle

On August 25, 2008, Bennett worked a shift out of the Rocky Mount yard from midnight until noon. JA376. She parked her car several hundred feet away from the company office, where it could not be seen by the yardmaster seated in the watch tower. JA206-08, 768-69. Many people have access to the lot where Bennett parked her car, including members of the public not affiliated with CSXT. JA216, 292.

Sometime between 3:00 and 4:30 a.m. (JA806-07), an unknown person vandalized Bennett's vehicle. The messages "Stay of[f] the railroad" and "Stupid n***a" were spray painted on Bennett's car. JA958, 960, 962. The rear passenger-side window of the car was broken (JA764, 958), and a black mannequin head was found inside with a rope around its neck (JA383, 765). The vandal left Bennett's purse and other valuables untouched. JA383. A can of white spray paint was recovered at the scene (JA300-01, 761, 958, 1075), but no fingerprints were found on the spray-paint can or on Bennett's vehicle (JA800).

8

Phone records indicate that Bennett made two brief outgoing calls to an unknown number around the time of the vandalism.[3]  JA423-26; *see* JA1071.  The first of these calls was placed at 1:29 a.m., and the second was at 3:28 a.m.  Neither counsel for CSXT nor counsel for Bennett have been able to determine the identity of the person Bennett called.  JA429-30.  When questioned at trial, Bennett professed not to know whom she was calling at these unusual times or why she placed the calls.  JA423-26.

The vandalism was discovered by CSXT employees and was reported to Gilbert, the trainmaster on duty that night, around 4:30 a.m. JA294, 300, 331.  Gilbert immediately called the CSXT Police, who in turn instructed him to call the Rocky Mount Police Department. JA331-32.  After surveying the scene, the police ran the vehicle's license plates and informed Gilbert sometime between 5:00 and 5:30 a.m. that the car was registered to Bennett.  JA301-02.  Before going off duty at 6 a.m. (JA331), Gilbert briefed both his boss and the trainmaster relieving him about the situation.  JA272, 275-76, 333.

---

[3]  Bennett placed these calls using her personal cell phone, even though federal regulations and CSXT rules both prohibit train and engine service employees from using cell phones while operating a train.  *See* JA272.

9

Bennett learned of the vandalism through a phone call from her cousin, who also worked for the railroad. JA379. Upon finishing her shift, Bennett rode to the yard office, where a company official provided her with contact information for a claims adjuster who would ensure that Bennett was reimbursed for the cost of repairing her vehicle. JA381-82. Bennett then walked to her vehicle, surveyed the damage, and called Wilkins, the training supervisor. JA382-83. Wilkins immediately traveled to Rocky Mount to assist her. JA205-06.

Both the local police and CSXT's human resources department investigated the vandalism. *See* JA790-91, 1013-14, 1017-20. The CSXT investigators obtained statements from Bennett, Gilbert, Howze and others and collected photographs of the vandalism. JA795-96. They interviewed at least eleven people—some multiple times—over the course of several days. JA837-38; *see* JA1017-20.

Two days after the incident, CSXT employee James Bradley told investigators in a written statement that he saw "a light colored Dodge Charger or Magnum" next to Bennett's vehicle at around 3:09 a.m. JA1074. Bradley "had not seen this vehicle before." *Id.* When Bradley heard about the vandalism from a coworker at 4:26 a.m. and went to see

10

it, the Dodge car "was now gone." *Id.* During his subsequent deposition and at trial, Bradley also recalled seeing an unfamiliar man standing next to the vehicle—a fact which he had not included in his written statement. JA666-70, 676-79.[4]

CSXT's police and human resources departments were unable to determine who committed the vandalism. JA817, 1010, 1013-14. The Rocky Mount Police Department was also unable to identify the perpetrator or connect the crime to any CSXT employee. JA817-18.

## B.    Bennett's Departure From CSXT

During its investigation of the vandalism, CSXT put Bennett on a paid leave of absence. JA832. At the conclusion of its investigation, CSXT informed Bennett that her paid leave would end and that she was scheduled to return to work on October 1, 2008. JA1010. But Bennett did not return to CSXT (JA833), claiming that she was unable to work for medical reasons. In late November 2008, Bennett's entire training class was indefinitely furloughed without pay due to economic conditions. JA257, 419-20. Nearly two years later, on July 26, 2010,

---

[4]    Bennett contended that Bradley embellished his story in exchange for favorable treatment by CSXT, but she did not argue that Bradley's initial statement that he had seen an unfamiliar car was unreliable. JA691-99, 705-07, 922-23.

CSXT sent letters to Bennett and the rest of her training class recalling them to work. JA420-21; *see* JA1005. Bennett never responded to her recall letter. JA421-22, 1006.

### C. Trial Proceedings

#### 1. William Darity's testimony

At trial, Bennett relied heavily on the testimony of Dr. William Darity, who testified over CSXT's objections (JA512-17) as an expert on workplace discrimination (JA521). Darity opined that Bennett was subjected to a hostile work environment (JA544), testifying that in "this seven day period between August 18 and August 25th, Ms. Bennett was subjected to a series of microaggressions cumulating with … a macroaggression when her automobile was vandalized." JA533. Darity also opined that Bennett was subjected to a hostile work environment when she returned from her shift following the vandalism because "no one from the in group walked with her to her car." JA543.

On cross-examination, Darity admitted that his analysis, which uses "a template or profile that identifies the occurrence of discrimination" (JA549), has never been peer reviewed and has never before been used or assessed in any court case (JA550).

### 2.    Testimony concerning lost income

Bennett presented testimony from a clinical psychologist, Dr. Nancy Alford. JA435. Alford opined that Bennett was suffering from post-traumatic stress disorder as a result of the vandalism. JA444. She stated that Bennett "will probably get better enough that she can function, but that's not going to happen any time soon." JA446.

Bennett also solicited testimony from a vocational rehabilitation specialist, Dr. Charles Vander Kolk. Vander Kolk opined that Bennett is "not at a point where she could function in a work environment" today (JA459), but that he is "hopeful that in some time in, say, one to five years that she should be able to do something in the work world" (JA463) and that "I would like to be optimistic and say it is going to be sometime after a year" (JA461-62). When confronted with evidence that Bennett had recently been working at a day-care center and making money by remodeling real estate, Vander Kolk conceded that Bennett was already "on the edge" of "[t]he work world." JA464.

In fact, the jury heard evidence that Bennett owned and operated three businesses: a day-care business, a catering business, and a real-estate remodeling business. JA345-46, 349, 405, 408, 411-12, 785-88.

13

According to her W-2 forms, after Bennett left the railroad she made $19,335 from these businesses in 2009 and $13,602 in 2010.  JA487, 489.  Bennett has not disclosed the income from her businesses in 2011 or subsequent years.  JA495-96.[5]

Bennett's sole estimate of her economic loss came from a forensic economist, Dr. Oliver Wood.[6]  In calculating Bennett's before-trial loss, Wood assumed that Bennett would have received her full salary from the time her paid leave ended until the time of trial.  JA489.  Wood did not exclude the furlough period, even though no one in Bennett's training class received pay during that time.  JA420, 507.  Wood

---

[5]  One of Bennett's friends, Curtis Young, testified about Bennett's remodeling business.  Young reported that he frequently speaks with Bennett and has "seen her do some remodeling work, and she do[es] a good job."  JA786.  According to Young, Bennett is "hands on" in the remodeling work and "get[s] in there with her tools."  *Id.*  Bennett's bank statements show that she was making as many as 17 trips to hardware stores each month.  JA417; *see* JA1021-42.  Young testified that after Bennett remodels a house, she "sell[s] it" for a profit (JA787); Bennett said that she remodels the homes as "rental property … [t]o provide income" (JA412).  Although the exact number is disputed, Bennett has remodeled between four and twelve properties since leaving CSXT.  JA411.

[6]  Wood evaluated Bennett's economic loss under two separate scenarios.  Because Bennett sought and received lost income under only the first scenario (Dkt. No. 199 at 5; JA70-74), we discuss only that scenario here.

14

subtracted the income Bennett earned through other employment in 2009 and 2010 "that I know about" (JA489), but he did not deduct her other income in 2011 because he "[did]n't know it" (JA496; *see also* JA495). Wood also included a line item for "loss of personal services," based on Bennett's assertion that she used to do 23 hours of chores per week but now does only 10.5 hours of chores.[7]  JA488.  Wood thereby estimated a total before-trial loss of $92,835.  JA490, 1001.

Notwithstanding the evidence of Bennett's current business activities and future work potential, Wood calculated Bennett's future lost pay based on the assumption that she was "[a] hundred percent unemployable" and would remain so "[f]or the rest of her adult life." JA500-01.  And although Bennett had never worked for any employer for longer than five years (JA500), Wood assumed that Bennett would have continued working for CSXT until age 67—*i.e.*, 27 years (JA486).

---

[7]  Wood relied on Bennett's representations that she could not do any errands outside the house such as clothes shopping or pumping her own gas.  JA497-98.  But Wood admittedly had not reviewed the bank statements and other financial records provided to him (JA499), which showed that Bennett routinely went shopping and performed other chores outside the house.  *See* JA403, 412-17.  Similarly, Wood accepted at face value Bennett's representation that she could not do any painting (JA497), when in fact she had an active home-remodeling business.

He projected that she would have continued to receive her full conductor salary for the next 27 years, with annual raises, and subtracted no mitigating income. JA487, 490, 495-96, 1002. After present-value discounting, Wood calculated that Bennett's future lost income was $598,438. JA490, 1002.

### 3. CSXT's excluded evidence

CSXT sought to introduce testimony from Dr. Charles Manning, an expert in the field of fire investigation. JA859. Manning would have testified that Bennett has engaged in a pattern of filing vandalism claims to obtain a financial payout, often through insurance. JA858-66; *see also* Dkt. No. 183. As the district judge put it, the excluded evidence supports the theory "that the plaintiff did this" herself. JA867; *see also* JA783 ("THE COURT: So your case is that the plaintiff staged this? … That will be interesting.").

The proffered evidence would have shown that Bennett sought payment for three other alleged acts of vandalism between 2007 and 2010:

- In July 2007, Bennett reported that her Chevrolet Suburban was stolen and found destroyed by fire. JA859-60. No suspect was ever identified. JA861. Days later, Bennett filed an insurance claim reporting the loss of not only the

16

car, but also $5,000 in cash, a laptop, and expensive catering equipment that she claimed had been inside the vehicle—none of which she had reported to the police. JA860.

- In April 2010, Bennett reported that someone had thrown a Molotov cocktail through the window of her home. JA861-62. An investigation by the Northampton County Sheriff's Department concluded, however, that the plastic jug allegedly thrown into Bennett's home could not have fit through the hole in her window. *Id.* No suspect was ever identified. JA861.

- Later that month, a fire destroyed one of the two buildings operated by Bennett's day-care business. JA862. An investigation found that the fire, which occurred in the middle of the night, was intentionally set from inside the building. *Id.* No one was ever charged with the crime. Bennett's insurance claim, filed two weeks later, reported that she had also lost $5,000 of cash in the fire—a fact not previously reported to the police. *Id.* Bennett received $185,000 from her insurance company on her claim. JA872.

Bennett's pattern of seeking financial recovery based on questionable vandalism claims began shortly after her catering business suddenly lost a lucrative contract. JA863, 866-67.[8]

Manning was prepared to testify that his investigation of these incidents, under accepted principles of investigation, points to Bennett

---

[8] In a separate incident, Bennett reported in September 2008 that somebody burned a cross on her front lawn. JA859, 866; *see also* JA781-82. That incident was investigated by the U.S. Department of Justice, the FBI, and the North Carolina State Bureau of Investigation. JA780-82. The investigation was later discontinued due to lack of evidence and problems with the credibility of the complainant. *Id.*

as a suspect in the vandalism of her vehicle. *See, e.g.*, JA863-64 (discussing literature on the investigation of serial fires); JA866 ("[S]he had a pattern there that she was paid money or received money in the form of compensation, [in] which she claimed to be the victim."). Despite CSXT's argument that Manning's testimony and the underlying evidence were admissible as evidence of motive, intent, and a common plan or scheme under Federal Rule of Evidence 404(b)(2) (JA866-67), the district court excluded the evidence (JA873).

### 4.    Jury charge and verdict

The district court ruled that, to impute liability to CSXT on the Title VII claim, the jury would have to find that Bennett was subjected to a hostile work environment *by her supervisors.* JA888, 890-91, 937-39, 947, 950-51, 952-53; *see also* JA68 (verdict form question asking whether "Plaintiff was subjected *through [her] supervisors* to a hostile work environment") (emphasis added).   Bennett's counsel confirmed that her Title VII claim relied on a theory of supervisor liability:

> THE COURT: [Y]our case is that the supervisors … caused her to leave.  And all of the circumstantial evidence that you have tried to put on had to do with binding the employer by its supervisors.
>
> MR. McLEOD: Correct, Your Honor.

JA890-91.

At the close of plaintiff's evidence and again during the charge conference, the court discussed with the parties whether Bennett would seek a finding of constructive discharge. When CSXT moved at the close of plaintiff's evidence for judgment as a matter of law, the court opined "that the Title VII claim ought to be charged and the issue ought to be whether [Bennett] suffered a constructive discharge…." JA564-65. Later, recognizing that this case is "not a literal discharge," the district judge advised Bennett's counsel that "it seems to me" that Bennett should seek a finding of "technical discharge or a constructive discharge." JA878; *accord* JA877 ("[I]t sounded like that's what it was, constructive discharge. Is it something else?").

At the charge conference, CSXT offered that, "in response to [the court's] comments about a constructive discharge, we have prepared [an] instruction on that issue." JA877. But the court responded that it was "up to the plaintiff" (*id.*) and declared that "I'm going to give the plaintiff's charge" (JA885). Although the court gave the parties until the following day to propose changes to the jury charge or the verdict

form (*id.*; *see* JA886), Bennett did not propose an instruction or seek a jury finding on constructive discharge.

The jury returned a verdict for CSXT on the FELA claim, but for Bennett on the Title VII claim, awarding her $150,000 in damages. JA68-69, 955.

### D.    Post-Trial Proceedings

After the trial, Bennett moved for front and back pay.  Dkt. Nos. 198-199.  Based on Wood's calculation, Bennett sought $592,869 in front pay and $92,835 in back pay.  *Id.*  CSXT objected that Bennett was not eligible for front or back pay because she did not establish constructive discharge and that the amounts sought were excessive and unsupported by the evidence.  Dkt. No. 202; *see also* Dkt. No. 215 at 17-26.  The district court nonetheless granted Bennett every penny that she requested, plus interest.  JA70-74.  By separate order, the district court awarded $796,951.39 in attorneys' fees.  JA127-37.  The district court subsequently denied CSXT's post-trial motion.  JA138-48.

### SUMMARY OF ARGUMENT

1.    To prevail on her Title VII claim, Bennett was obliged to prove that she was subjected to severe or pervasive race- or sex-based

harassment that was imputable to CSXT.  CSXT is entitled to judgment as a matter of law because the evidence does not satisfy this standard.

The centerpiece of Bennett's hostile-environment claim was the racially offensive vandalism of her vehicle.  Endeavoring to hold CSXT liable based on that incident, Bennett contended that the vandalism must have been committed by one of two supervisors—Gilbert or Howze.  But Bennett offered nothing beyond speculation to support that theory.  Without the vandalism, Bennett's other evidence failed to establish an actionable hostile work environment.  Neither Bennett's alleged conflicts with Gilbert over her scheduling requests and Howze over her inability to understand driving directions nor CSXT's alleged failure to shield Bennett from the distress of seeing her vandalized vehicle demonstrate that CSXT supervisors subjected Bennett to severe or pervasive harassment based on her race or sex.

2.    The district court also made two erroneous and prejudicial evidentiary decisions that necessitate a new trial.

First, the district court erroneously excluded evidence suggesting that someone other than a CSXT supervisor—probably someone associated with Bennett herself—may have been the perpetrator of the

21

vandalism. The excluded evidence would have shown that Bennett had twice filed insurance claims after another vehicle and a building she owned were destroyed by arson, and that on a third occasion her home was damaged by yet another fire of suspicious origin. That evidence strongly contradicted Bennett's contention that only Gilbert or Howze had a motive to damage her property.

The district court erred in concluding that this evidence was inadmissible under Federal Rules of Evidence 403 and 404. In an analogous case involving alleged insurance fraud, this Court held that such similar-fraud evidence is admissible under Rule 404(b)(2) to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" Because the probative value of such evidence is exceptionally high, it should not be excluded under Rule 403.

Second, the district court erred in admitting the testimony of Dr. Darity, Bennett's expert on workplace discrimination. Darity's testimony that Bennett was subjected to a hostile work environment was not helpful to the jury, but instead improperly supplanted the court's role as arbiter of the law and the jury's role as arbiter of the

22

facts. Moreover, because Darity's theories were result-oriented junk that was neither reliable nor based on scientific, technical, or other specialized knowledge, they should have been excluded under Federal Rule of Evidence 703 and *Daubert*.

3. The substantial award of back pay and the massive front-pay award are wholly improper. Bennett is not entitled to these equitable remedies at all, and the awards far exceed appropriate limits.

Because back and front pay are remedies for the discriminatory termination of employment, they are unavailable to a plaintiff who quits voluntarily unless the departure is consistent with the employee's duty to mitigate damages. Bennett elected not to seek a jury finding that harassment forced her to leave her job. Because she thereby eschewed any claim of constructive discharge, she was not entitled to any back or front pay.

Even if equitable remedies are permissible in these circumstances, however, the district court's awards are patently excessive. Bennett was awarded $592,867 in front pay—representing 27 years of her full salary with no offset for mitigating income. That front-pay calculation was predicated on the assumption that Bennett would never be able to

work again, which is irreconcilable with the prediction of Bennett's own vocational expert that she would be able to return to the work force within one to five years. Indeed, by the time of trial, Bennett had already earned substantial mitigating income from her day-care, catering and remodeling businesses. The award also was unduly speculative and excessive given the brevity of Bennett's tenure at CSXT (one week in the field), the fact that she had never held a job for more than five years, and the fact that her back-pay award reimbursed her for almost four years of lost salary.

The district court also miscalculated the back-pay award. It mistakenly used the back-pay award to compensate Bennett for a supposed reduction in her ability to perform household chores, which is an element of compensatory damages, not back pay. The district court also afforded Bennett an improper windfall by awarding her back pay for the 20-month period during which her training class was furloughed without pay and by failing to require Bennett to mitigate her damages throughout the entire back-pay period.

## STANDARD OF REVIEW

This Court reviews the district court's denial of judgment as a matter of law *de novo*. *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2000); *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998). The Court must decide "whether, viewing the evidence in the light most favorable to the appellee-plaintiff, there is substantial evidence to support the verdict." *Brady v. Allstate Ins. Co.*, 683 F.3d 86, 89 (4th Cir. 1982). Although the Court may not "'substitute [its] judgment of the facts for that of the jury,'" the Court's "'deference to the jury's findings is not … absolute: A mere scintilla of evidence is insufficient to sustain the verdict, and the inferences the jury draws to establish causation must be reasonably probable.'" *DeJarnette*, 133 F.3d at 297.

The Court reviews a district court's decision to admit or exclude evidence for abuse of discretion. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). A district court's evidentiary ruling will be deemed an abuse of discretion "if its conclusion is guided by erroneous legal principles, or rests upon a clearly erroneous factual finding." *Id.* (internal citations omitted). Moreover, "even if a district court applies the correct legal principles to adequately supported facts,

the discretion of the district court is not boundless." *Id.* This Court "is obligated to review the record and reasons offered by the district court and to reverse if the 'court has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" *Id.* (quoting *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 506 (4th Cir. 1977)).

A district court's rulings on damages, including awards of front pay and back pay, are also reviewed for abuse of discretion. *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 299 (4th Cir. 2009). The district court abuses its discretion "when it commits an error of law or clearly errs in making a finding of fact." *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 629 (4th Cir. 2006). Any award of front pay, moreover, "must be 'tempered' by 'the potential for windfall' to the plaintiff." *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 504 (4th Cir. 2001) (quoting *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)).

## ARGUMENT

## I.   THE EVIDENCE IS INSUFFICIENT TO SUPPORT LIABILITY UNDER TITLE VII.

To prevail on her hostile-environment claim, Bennett was required to prove "that the offending conduct (1) was unwelcome,

(2) was because of her sex or race, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011) (internal quotation marks and alteration omitted). To impute liability to CSXT, Bennett relied on the theory that the harassment was committed by a supervisor—namely, James Gilbert or Ed Howze. *See* JA888, 890-91, 937-39, 947, 950-51, 952-53; *see also* Dkt. No. 176 at 3 (Bennett's trial brief).[9]

The evidence presented at trial was not sufficient to sustain liability. Bennett did not present *any* evidence—only speculation—that Gilbert or Howze vandalized her vehicle. And without the vandalism, the evidence does not show that Bennett was subjected to severe or pervasive harassment on the basis of race or sex.

---

[9] Aside from Bennett's theory of supervisor liability, a Title VII plaintiff may also impute liability to his or her employer if the plaintiff was harassed by a coworker and the employer negligently failed to take action to prevent it. *See Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc). Bennett disclaimed that theory. JA890-91.

### A. There Was No Evidence That James Gilbert Or Ed Howze Vandalized Bennett's Vehicle.

The centerpiece of Bennett's Title VII claim was the racially offensive vandalism of her vehicle. *See, e.g.*, JA158-59, 380-86, 904-05, 929; *see also* JA149 (identifying the vandalism as "the precipitant event"). To impute liability for this conduct to CSXT, Bennett surmised that a supervisor—specifically, James Gilbert or Ed Howze—committed or orchestrated the vandalism.[10] Because Bennett offered nothing more than speculation to support that theory, however, the evidence is insufficient to sustain the verdict.

This Court has repeatedly held that a jury may not render a verdict based on mere speculation or conjecture. *See, e.g.*, *Gibson v. Old Town Trolley Tours of Wash., D.C., Inc.*, 160 F.3d 177, 181-82 (4th Cir.

---

[10] In light of binding Fourth Circuit precedent (*see Whitten v. Fred's, Inc.*, 601 F.3d 231 (4th Cir. 2010)), this case was tried on the assumption that Gilbert and Howze qualify as supervisors under Title VII. However, the Supreme Court is now reviewing that standard. *See Vance v. Ball State Univ.*, No. 11-556 (U.S. argued Nov. 26, 2012). If the Supreme Court adopts the Seventh Circuit's rule, under which supervisor liability applies only to action taken by those who have "power to hire, fire, demote, promote, transfer, or discipline" the plaintiff (*Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998)), Gilbert and Howze would not qualify as supervisors and the verdict would need to be vacated on that basis. *See, e.g.*, JA602 (trainmasters "don't have the authority" to fire crewmembers).

1998) (reversing verdict for plaintiff on Title VII retaliation claim); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) ("mere speculation or the building of one inference upon another" is insufficient to create a jury issue). Although a jury may draw reasonable inferences from the evidence, "'permissible inferences must still be within the range of reasonable probability' … rather than mere 'possibility.'" *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241-42 (4th Cir. 1982) (alteration omitted) (quoting *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958)); *see also Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) ("inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture"). When a plaintiff's case "is so tenuous that it rests merely upon speculation and conjecture," it is "the duty of the court to withdraw the case from the jury." *McDavid*, 259 F.2d at 266; *cf. Williams v. Cerberonics, Inc.*, 871 F.2d 452, 458 (4th Cir. 1989) ("in the discrimination area the danger of improvidently sending a case to the jury is amplified by the inherent difficulties in conclusively proving matters of motive and intent"). "Such an approach protects against the danger that a jury will make a decision based on sheer

29

speculation, tainted by impermissible factors such as jury sympathy." *Oglesby v. Ford Motor Co.*, 2005 WL 1993434, at *6 (E.D. Va. 2005) (citing *Lovelace*, 681 F.2d at 242, and *McDavid*, 259 F.2d 261).

Bennett introduced no evidence that James Gilbert or Ed Howze committed or caused the vandalism. No one ever saw either man near Bennett's vehicle. No one ever saw either man with spray paint, rope, or a mannequin head; nor was there testimony that either had purchased these items. No one saw either man with paint on his clothing or skin after the event. Neither man's fingerprints were recovered from Bennett's vehicle or the spray-paint can. There is no evidence that either man engaged in any suspicious communications near the time of the vandalism. And while Gilbert was on duty at Rocky Mount on the night in question, Howze undisputedly was at home with his wife when the vandalism occurred. JA604.

The court below recognized that Bennett "did not present any direct evidence that Mr. Gilbert or Mr. Howze vandalized her car," but opined that there was "ample *circumstantial* evidence that members of defendant's management vandalized" the vehicle. JA140 (emphasis added). The court gave no hint what that "circumstantial evidence"

might be.  *Id.*  Bennett cited her disagreements with Gilbert and Howze as evidence that one of them must have been the culprit (JA928-29), but those workplace conflicts do not show that either man had the motive to commit an extreme and illegal act of vandalism—much less that either man actually did so.

In fact, Bennett's so-called evidence amounted to no more than "[s]peculation and mere possibility"—not the "'reasonable probability'" that is the "proper test of sufficiency of circumstantial evidence.'" *Disher v. Fast Fare, Inc.*, 898 F.2d 144 (table), 1990 WL 29208, at *3 (4th Cir. 1990) (per curiam) (quoting *Lovelace*, 681 F.2d at 242).  There is no better confirmation of that than Bennett's inability to say *which* man—Gilbert *or* Howze—supposedly was responsible. Because the so-called circumstantial evidence does not even point to a particular perpetrator, it necessarily is too speculative to support the verdict.

Bennett's alternative theory that CSXT may be held liable even if "CSX management did not vandalize the car … because of the way they handled the vandalism in the aftermath" (JA895) also fails to justify the verdict.  Bennett was required to prove that "an actionable hostile environment [was] *created by a supervisor*" with authority over her.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (emphasis added). The suggestion that supervisors should have done more "to call [Bennett], to warn her" or "to introduce her to [the] trauma" of the vandalism (JA895) is not an allegation that they intentionally "created" a hostile environment, as Title VII requires (*Ellerth*, 524 U.S. at 765). Nor does such evidence establish "severe or pervasive" harassment based on race or sex. *See, e.g., Banks v. United Parcel Servs., Inc.*, 2005 WL 2436725, at *8 (W.D. Tenn. 2005) ("Although plaintiff may have a reasonable basis for being disappointed about the apparent lack of any response by [his employer], that inaction does not constitute intimidation, ridicule, and insult.").

Nor can Bennett attribute these alleged failures to Gilbert, who had begun his shift at 6 p.m. the previous day and was scheduled to go off duty by 6 a.m. JA331. Before going off duty, Gilbert fully briefed both his boss and the trainmaster relieving him about the situation. JA275-76, 333; *accord* JA272 ("I had reported all the incidents and everything I knew about what had transpired to my bosses, the proper authorities and everyone else."). If Bennett believes that some other supervisor should have aided her when she returned from her shift, she

32

failed to establish who that person was, much less that his or her failure to take action was motivated in any way by Bennett's race or sex.

### B.   The Remaining Incidents Identified By Bennett Cannot Sustain Liability On A Title VII Hostile-Environment Claim.

Setting aside the vandalism, all that remains are two isolated incidents in which Gilbert allegedly became "unpleasant[]" over Bennett's multiple requests for schedule changes (JA360) and Howze sent her home after the two clashed over Bennett's difficulty following driving directions (JA368-69, 372). As the district judge remarked in response to CSXT's motion for judgment as a matter of law, these two incidents were plainly insufficient to sustain liability as "standalone issues." JA565.

To begin with, to establish a hostile-environment claim, a plaintiff must prove that the alleged harassment was "severe or pervasive." *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008). That is "a high bar." *Id.* at 315. The plaintiff must prove not only that she subjectively perceived the harassment to be so severe or pervasive as to alter the terms or conditions of her employment, but also that a

reasonable person in her position would likewise have found the work environment to be hostile or abusive. *Bonds*, 629 F.3d at 385; *Sunbelt Rentals*, 521 F.3d at 315.

Two isolated and unrelated disagreements over requests for schedule changes and for directions to a work site do not constitute "pervasive" harassment, and these examples of ordinary workplace conflicts are far from "severe." As this Court has recognized, "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life." *Sunbelt Rentals*, 521 F.3d at 315. Thus, "'callous behavior by one's superiors' or 'a routine difference of opinion and personality conflict with one's supervisor' are not actionable under Title VII." *Id.* at 315-16 (quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000)). Bennett's one-time run-ins with Gilbert and Howze plainly fall within this category.

Bennett also failed to adduce evidence that her disagreements with Gilbert and Howze would not have occurred "but for" her race or sex. *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997); *see also Bonds*, 629 F.3d at 385-86. As to Gilbert, Bennett "failed to present any evidence suggesting [that his] conduct was motivated by" her race or sex, since Gilbert "never made any derogatory comments about" her race or sex "and nothing about his conduct suggests it was based on these factors." *Causey*, 162 F.3d at 801. Similarly, Howze's purported conflict with Bennett began over the phone, before Howze had ever met or seen her; Howze testified without contradiction that he did not even *know* Bennett's race until after they had already exchanged words. JA580. And Bennett's uncorroborated assertions that Gilbert and Howze each briefly referred to her as a "lady" (JA362, 369, 371; *but see* JA329) are too thin to show that these disagreements would not have occurred "but for" her sex.

Even assuming that these incidents occurred in exactly the way Bennett describes them, they were insufficient as a matter of law to create a hostile environment actionable under Title VII. Indeed, there

35

is no basis to conclude that Gilbert's actions were improper *at all*. *See* JA825. And while CSXT determined that Howze exercised poor judgment when he took Bennett off of railroad property, for which he was disciplined (*see* JA606, 825-26), that single act of poor judgment is legally insufficient to constitute severe or pervasive harassment, even if Bennett had identified evidence linking that act to her race or sex (which she did not). *See Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000) ("a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment"); *Adams v. City of Chicago*, 706 F. Supp. 2d 863, 880 (N.D. Ill. 2010) ("Measured discipline for legitimate rules violations and a single angry outburst does not constitute severe or pervasive conduct."); *cf. Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 775-78 (3d Cir. 2009) (supervisor's poor judgment did not create a hostile environment). The evidence therefore was legally insufficient to sustain a finding of liability on Bennett's Title VII claim.

## II.  THE DISTRICT COURT'S ERRONEOUS EVIDENTIARY RULINGS NECESSITATE A NEW TRIAL.

The district court made two erroneous and prejudicial evidentiary rulings that necessitate a new trial.  First, it excluded evidence suggesting that the vandalism was committed by someone other than a CSXT supervisor.  Second, it allowed Bennett to present unreliable expert testimony that usurped the roles of the court and jury.  Each of these highly prejudicial errors independently warrants a new trial.

### A.  The District Court Erroneously Excluded Evidence Indicating That The Vandalism Was Committed By Someone Other Than A CSXT Supervisor.

CSXT sought to introduce evidence suggesting that the vandalism of Bennett's vehicle was part of a fraudulent scheme in which Bennett staged acts of vandalism against her own property in order to obtain financial recovery.  The excluded evidence would have shown that Bennett reported the theft and destruction of another vehicle under suspicious circumstances, then sought and obtained a substantial payout from her insurance company; that she recovered $185,000 on another insurance claim after a fire destroyed a building she owned through her day-care business, even though investigators later determined that the fire must have been intentionally set by someone

37

who had access to the building outside of business hours; and that Bennett reported that her home was damaged in an attempted arson that could not possibly have occurred as Bennett described, because the gasoline-filled jug that she alleged to have been thrown through her window was too large to fit through the broken windowpane. No suspect was ever charged with those crimes, but considerable evidence indicates that Bennett or someone associated with her was responsible for each incident.

CSXT advised the court that it wished to introduce this evidence in support of an argument that Bennett herself staged the vandalism as part of a scheme to defraud. JA783, 866-67. That theory would have been reinforced by the evidence that Bennett made two outgoing phone calls to an unknown person around the time that the vandalism occurred, that an unfamiliar Dodge car and unknown man were seen near Bennett's car at around that same time, and that Bennett began calling law firms to inquire about suing CSXT before the vandalism even occurred. Although the district court recognized that the excluded evidence supports the theory "that the plaintiff did this" herself (JA867)—that is, that Bennett arranged for someone to stage the

vandalism in a secluded part of the parking lot while she was working the night shift—it refused to permit the jury to hear that evidence. At trial, the court stated that "it's 404(b) and I'm not going to allow it," and "under 403 I wouldn't allow it, because it would inflame the jury." JA873. In a subsequent order denying CSXT's motion for a new trial, the court opined that the evidence was "not relevant" (JA143) and that, even if relevant, its probative value was "substantially outweighed by the danger of confusion of the issues or misleading the jury" (JA144).

In excluding this critical evidence, the district court abused its discretion. In *Westfield Insurance Co. v. Harris*, 134 F.3d 608 (4th Cir. 1998), this Court held that a district court abused its discretion by excluding evidence showing a pattern of possible insurance fraud. In so holding, it explained that such evidence is admissible because an improbable pattern of suspicious claims, by itself, raises the inference that the person making the claims is responsible. *See id.* at 613-14. *Westfield* confirms that none of the three justifications cited by the district court supports the exclusion of CSXT's evidence.

To begin with, contrary to the district court's ruling that CSXT's evidence was "not relevant" (JA143), *Westfield* specifically recognized

that a pattern of similar fraud by the purported victim constitutes "critical evidence" in a dispute about the cause of a similar incident (134 F.3d at 610). Indeed, courts have recognized that "evidence of similar wrong conduct is especially relevant to probe the questions of intent and a plan." *Dial v. Travelers Indem. Co.*, 780 F.2d 520, 523 (5th Cir. 1986); *see also id.* at 522-23 (evidence of similar subsequent incidents was "admitted to show a plan, etc."). The probative value of such evidence is particularly strong when a person claims to have experienced several such unlikely events, because "there comes a point when the accumulation of several claims, by itself, creates suspicion." *Westfield*, 134 F.3d at 613 n.*; *see also id.* at 615 (discussing the doctrine of chances); *United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991) ("Dean Wigmore's 'doctrine of chances' tells us that highly unusual events are highly unlikely to repeat themselves," which "support[s] an inference that the [unusual events] were the product of design rather than the vagaries of chance.").

CSXT's evidence that Bennett herself staged the vandalism is at least as relevant and as strong as any evidence Bennett cited for her claim that Gilbert or Howze was responsible. Bennett contended that

Gilbert or Howze had a motive to commit the vandalism, and thus must have done so, because they had been critical of her earlier in the week. Such attenuated "motive" evidence is far less probative than evidence that Bennett herself repeatedly staged acts of vandalism for financial gain. Indeed, even if Bennett was not responsible for the vandalism, the fact that she experienced other acts of vandalism unconnected to CSXT would have been highly relevant to show that someone other than Gilbert or Howze might be targeting her. Because the question of who committed the vandalism obviously was a "fact … of consequence in determining the action" and CSXT's evidence "ha[d] [a] tendency to make [that] fact more or less probable than it would be without the evidence," the excluded evidence plainly was relevant. Fed. R. Evid. 401; *accord United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) (Rule 401 "presents a low barrier to admissibility").

The evidence was also admissible under Federal Rule of Evidence 404(b). Although that rule does not permit evidence of prior acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" (Fed. R. Evid. 404(b)(1)), it expressly provides that evidence of a person's other crimes,

wrongs, or bad acts "may be admitted [to show] 'motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident'" (*Westfield*, 134 F.3d at 614 (quoting Fed. R. Evid. 404(b)(2))). Courts throughout the country have held that similar-fraud evidence, such as the evidence CSXT sought to introduce here, is admissible under this exception. *See, e.g.*, *Rogers v. Allstate Ins. Co.*, 47 F. App'x 797, 798 (8th Cir. 2002) (per curiam) (similar-fraud evidence "was relevant to show motive, opportunity, and intent"); *Westfield*, 134 F.3d at 614 (similar-fraud evidence was relevant to whether incident was "part of a plan or scheme" to defraud); *York*, 933 F.2d at 1349 (similar-fraud evidence was "admissible under [R]ule 404(b) because it showed … inten[t] to defraud"); *Dial*, 780 F.2d at 523 ("evidence of similar wrong conduct is … relevant to … the questions of intent and a plan"); *Hammann v. Hartford Accident & Indem. Co.*, 620 F.2d 588, 589 (6th Cir. 1980) (similar-fraud evidence "was properly admitted for a number of reasons," including "motive").

Finally, the district court erred in concluding that the evidence's "probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. This Court has instructed that "[b]ecause

the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996).  There can be little question that the probative value of similar-fraud evidence is exceptionally high when the central question in dispute is the identity of the person who committed an act of vandalism and the plaintiff attempts to prove that the defendant is responsible by eliminating other possibilities.  Indeed, *Westfield* characterized analogous evidence of a pattern of fraud as "critical" in a case such as this.  134 F.3d at 610.  By comparison, there is little reason to think that Bennett would have been unfairly prejudiced by this evidence.  While the jury might have been more likely to rule against her if it concluded that she *had* been staging acts of vandalism for financial gain, and thus had failed to prove that *this* act of vandalism must have been committed by Gilbert or Howze, "[p]rejudice under Federal Rule of Evidence 403 is certainly not established from the mere fact that the evidence is highly probative." *Id.* at 615.

43

**B.    The District Court Erred In Admitting The Testimony Of William Darity.**

Over CSXT's objection, the court allowed Bennett to offer testimony from professor William Darity, Jr., who opined that Bennett was subjected to a hostile work environment.  Darity's opinions were mere legal conclusions that were inadmissible under Rules 702 and 403.  They also were inadmissible under Rule 703 and *Daubert* because they were neither reliable nor based on scientific, technical, or other specialized knowledge.

### 1.    Darity's opinions were inadmissible under Rules 702 and 403.

Darity's role was "to render an opinion that there was workplace discrimination."  JA512.  That testimony was plainly improper.  Darity first usurped the court's role by opining as an expert on the law, and then usurped the jury's role by crediting Bennett's version of the facts.

Because "it is the responsibility—and the duty—of the court to state to the jury the meaning and applicability of the appropriate law" (*Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986)), "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible" (*United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)).  Put

44

differently, "the jury must be instructed on the law by the court and not by the witnesses." *United States v. Wilson*, 133 F.3d 251, 265 (4th Cir. 1997); *see also id.* at 265-66 (courts "should not … allow[] [expert witnesses] to give opinions on what the law means or how it is interpreted").

Expert opinions concerning the ultimate legality of the defendant's conduct also are inadmissible. *See McIver*, 470 F.3d at 561-62. "'When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" *United States v. Chapman*, 209 F. App'x 253, 269 (4th Cir. 2006). Such evidence is inadmissible under *both* Rule 702 *and* Rule 403, because the risk of confusing or misleading the jury on legal issues "substantially outweigh[s]" what little probative value the testimony may have. Fed. R. Evid. 403; *see, e.g.*, *United States v. Cecil*, 836 F.2d 1431, 1441 (4th Cir. 1988) (Rule 403, in conjunction with Rule 702, "'assur[es] against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.'") (quoting Fed. R. Evid. 704 advisory committee's note).

Darity's testimony violated both of these strictures. In opining that Bennett "was subjected to a hostile work environment based upon the way [CSXT] reacted to the vandalism" (JA543) and that this was true "whether CSX employees were responsible for the vandalism or not" (*id.*), Darity improperly supplanted the judge's role as interpreter of the law. Indeed, Darity's opinion that it did not matter who had committed the vandalism was flatly at odds with the court's instruction that Bennett had to prove "that supervisors or persons in a position of authority with management caused her to suffer a hostile work environment because of her race or gender." JA938. Darity also improperly told the jury "what result to reach" (*Chapman*, 209 F. App'x at 269), opining among other things that Bennett "was subjected to a hostile work environment" (JA544) and that CSXT "failed to adequately enforce its discrimination policy" (JA544-45). Such opinions do not help the jury, but merely "'substitute the expert's judgment for the jury's.'" *Chapman*, 209 F. App'x at 269.

Other courts have held testimony similar to Darity's to be inadmissible. In a case that is closely analogous to this one, for example, the plaintiff sought to call a social psychologist and social

46

worker as expert witnesses "to testify about sexual harassment … and whether or not there has been sexual harassment and a hostile work environment" in that case. *Lipsett v. Univ. of P.R.*, 740 F. Supp. 921, 925 (D.P.R. 1990). The court excluded the testimony, explaining that "expert testimony on these matters usurps the prerogative of the jury as the fact finder and would not assist the jury in understanding the evidence or determining a main issue" in the case. *Id.* Indeed, the court noted, expert testimony as to whether the plaintiff experienced discrimination "would not bring to the jury 'anything more than the lawyers can offer in argument.'" *Id.* Similarly, the Eleventh Circuit has held that expert testimony about whether the plaintiff was a victim of discrimination "would not assist the trier of fact" and is inadmissible under Rule 702. *Barfield v. Orange Cnty.*, 911 F.2d 644, 651 n.8 (11th Cir. 1990).

Rather than excluding Darity's improper and prejudicial opinions, the district court suggested that CSXT should "call [its] own expert" to "offer a counter opinion" (JA516-17), but this would not have cured the district court's error. Dueling witnesses each telling the jury what the law means and what result to reach is no better than one witness doing

47

so. *See, e.g.*, *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005) ("The opportunity for … presentation of contrary evidence … is not a basis for allowing otherwise inadmissible testimony to be admitted."). It is exclusively the duty of *the judge* to tell jurors what the law is, and it is exclusively the province of *the jury* to apply the law to the facts. Darity's testimony usurped both roles and thereby violated Rules 702 and 403.

### 2. Darity's testimony was inadmissible under Rule 703 and *Daubert*.

Darity's testimony also should have been excluded under Federal Rule of Evidence 703 and *Daubert* because it was neither reliable nor based on scientific, technical, or other specialized knowledge. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The trial court has a "basic gatekeeping obligation" to ensure that expert testimony "'both rests on a reliable foundation and is relevant to the task at hand.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147 (1999) (quoting *Daubert*, 509 U.S. at 597). To satisfy this standard, expert testimony must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and all

48

inferences must be derived using scientific or other valid methods. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

Darity's testimony flunks this standard. He testified at his deposition that his methodology amounts to little more than "[d]eductive reasoning maybe" (JA54) and testified at trial that he has "a template or profile that identifies the occurrence of discrimination" (JA549) by subjectively labeling events "microaggressions" or "macroaggressions" (JA532). Darity conceded at his deposition, however, that his approach has not been peer-reviewed (JA55-56) and that he was not aware of *any* published work advocating his approach to causal analysis (JA57); at trial, he pointed only to a "mention" of it in a single 1981 article (JA549-50) and conceded that his analysis has not previously been examined or used in *any* court case (JA550). Even more significantly, Darity acknowledged that another social scientist who examined the same documents might reach a different conclusion, so his work fails *Daubert*'s reliability requirement. *See* JA56. Darity's testimony thus failed to comply with the basic requirements of Rule 703 and should have been excluded.

49

## III. THE DISTRICT COURT ERRED IN AWARDING FRONT AND BACK PAY.

The district court awarded Bennett nearly $700,000 in front and back pay—an amount based on the counterfactual assumption that Bennett will be incapable of ever working again for the rest of her life. In fact, Bennett was not eligible to recover *any* front or back pay because she neither sought nor obtained a jury finding of constructive discharge. Even if she were eligible for these remedies, however, the amounts awarded by the district court were grossly excessive and unsupported by the evidence.

### A. Bennett Is Not Eligible For Front Or Back Pay Because She Neither Sought Nor Obtained A Finding Of Constructive Discharge.

A Title VII plaintiff seeking front and back pay must show either that she was actually discharged, which Bennett does not claim, or that she was constructively discharged, which requires "the trier of fact [to] be satisfied that the [employee's] working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *See, e.g.*, *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). Although constructive discharge is a question of fact for the jury, Bennett neither

sought nor obtained a jury finding on constructive discharge; indeed, she affirmatively declined to submit the issue to the jury, even after the district judge suggested that she do so. Bennett's failure to obtain a finding of constructive discharge precludes her from recovering any award of front or back pay.

### 1. Bennett is not eligible for front or back pay absent a finding of constructive discharge.

As this Court held nearly two decades ago, "the specific remedies of backpay and reinstatement"—or, in this case, front pay in lieu of reinstatement—"are dependent upon the proof of some adverse action taken by the employer, [such as] constructive discharge." *Johnson v. Shalala*, 991 F.2d 126, 130 n.* (4th Cir. 1993). That requirement is a corollary of the statutory duty to mitigate damages. 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence … shall operate to reduce the back pay otherwise allowable."); *see Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1273 (4th Cir. 1985). The duty to mitigate ordinarily requires a plaintiff to remain at her job while corrective measures are taken, because her continued salary and

employment mitigate any damages.[11]   Only if workplace conditions become so irremediably hostile that the plaintiff has no choice but to resign—*i.e.*, a constructive discharge—can the plaintiff demand front and back pay for whatever lost income she is not able to reasonably mitigate through other employment.

Consistent with this Court's decision in *Johnson*, eight other circuits to consider the issue have held that a plaintiff who does not remain on the job is not entitled to an award of front or back pay for the period after his or her departure absent actual or constructive discharge.[12]

---

[11] *See, e.g.*, *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 680 (7th Cir. 2010) (the constructive-discharge requirement arises from "the burden … on the employee to show why … [he] had to 'quit immediately … why, in other words, his duty to mitigate damages did not require him to remain'"); *Jurgens v. EEOC*, 903 F.2d 386, 389 (5th Cir. 1990) (the constructive-discharge requirement "simply hold[s] … that [an] employee's duty to mitigate damages encompasses remaining on the job" whenever feasible); *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250, 256 (6th Cir. 1986) ("Absent constructive discharge, [the plaintiff] had a duty to mitigate his damages by remaining on the job."); *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981) ("A Title VII plaintiff must, therefore, 'mitigate damages by remaining on the job' unless that job presents 'such an aggravated situation that a reasonable employee would be forced to resign.'").

[12] *See, e.g.*, *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir. 2001); *Jurgens*, 903 F.2d at 389; *Gomez*, 803 F.2d at 256; *Maney v. Brinkley*

Because it derives from the duty to mitigate, this constructive-discharge requirement is not always absolute; this Court has declined to apply the "constructive discharge rule" when doing so would not be consistent with the statutory duty to mitigate damages, such as when a plaintiff quits to take a higher-paying job elsewhere. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 651 (4th Cir. 2002). Thus, the Court has held that an employee who leaves her job voluntarily "after being denied promotion" to take a position at another employer where she would "ma[ke] substantially more money over the … period between leaving … and trial than she would have made had she stayed" does not forfeit her right to back pay. *Id.* at 652. Similarly, the Court has held that a plaintiff who was denied a promotion could recover lost income despite the lack of a constructive-discharge finding because she mitigated her damages by leaving her $900-per-month job to work for a competitor who paid $1,200 per month. *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir. 1981). Here, however, Bennett had no claim that she lost *any* pay until she left her job at

---

*Mun. Waterworks & Sewer Dep't (Ark.)*, 802 F.2d 1073, 1075 (8th Cir. 1986); *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986); *Satterwhite v. Smith*, 744 F.2d 1380, 1381 n.1 (9th Cir. 1984); *Clark*, 665 F.2d at 354.

CSXT, and she left without any prospect of higher-paying employment. Without a showing that she was constructively discharged or that leaving CSXT served to mitigate her damages, Bennett is not entitled to front or back pay.

The district court read *Dennis* as holding that Title VII plaintiffs are never required to prove constructive discharge in this Circuit. *See* JA146-47. It was mistaken. Although *Dennis* stated that this Circuit "does not apply the 'constructive discharge rule'" as a categorical matter, it reaffirmed that Title VII plaintiffs are subject to a "general statutory duty … to mitigate employer damages." 290 F.3d at 651. Contrary to the district court's view that this duty to mitigate *replaces* any constructive-discharge requirement, the duty to mitigate *gives rise to* the constructive-discharge requirement. *See supra* pp. 51-52. It is implausible that the *Dennis* panel meant to depart from the Court's prior statement in *Johnson*—and from the view of eight other circuits— through a single sentence that did not even mention the unbroken line of contrary authority. Instead, *Dennis* simply recognized a narrow exception to the constructive-discharge requirement for cases in which strict application of a constructive-discharge rule would contravene the

statutory duty to mitigate. Because this case falls outside that narrow exception, Bennett was obligated to seek and obtain a finding of constructive discharge as a precondition for any award of front or back pay.

Nor can Bennett recover front or back pay without proof of constructive discharge under *Wells v. North Carolina Board of Alcohol Control*, 714 F.2d 340 (4th Cir. 1983). Wells alleged that he was wrongfully denied a promotion from stock clerk to cashier; shortly thereafter, he injured his back, was no longer able to perform the heavy lifting required of a stock clerk, and was forced to quit. *Id.* at 341-42. His employer argued that Wells had not shown constructive discharge because "there was no evidence that it acted to make the [stock clerk] job unattractive to Wells." *Id.* at 342. In holding that the employer's intent is not relevant to the question of constructive discharge, the Court emphasized that "Wells reasonably ended his employment for reasons beyond his control, reasons which were causally linked to the defendant's wrongful denial of a promotion." *Id.* *Wells* thus confirms that a plaintiff may not receive back pay unless the employer's wrongful conduct compelled her to leave her job. *See Jurgens v. EEOC*, 903 F.2d

386, 389 n.2 (5th Cir. 1990) (explaining that *Wells* does not support a broad exception to "the objective reasonable-employee constructive discharge standard"). That standard does not permit an award of back pay in this case, in which Bennett was never asked to leave and she neither sought nor obtained a finding that the circumstances preceding her departure required her to leave.

### 2. Bennett did not seek or obtain a finding of constructive discharge.

Bennett failed to satisfy the constructive-discharge requirement for an award of front or back pay because she did not seek or obtain a finding of constructive discharge in this case. Even after the district court suggested that Bennett ought to ask the jury to address whether she suffered a constructive discharge (JA564-65), and even after it suggested that she seek a finding of "technical discharge or a constructive discharge" (JA877-78), and even after CSXT proposed an appropriate constructive-discharge instruction (JA877), Bennett did not request that any constructive-discharge question be included on the jury form; nor did she discuss constructive discharge in her proposed jury charge, which the district court adopted as the basis for its instructions (JA885).

56

By failing to submit this issue to the jury, even after the court suggested that she do so, Bennett procedurally defaulted on an indispensible requirement for obtaining front or back pay. As the Third Circuit has squarely held, a Title VII plaintiff's decision not to pursue a claim of constructive discharge at trial precludes an award of back pay. *See Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006). The First Circuit has likewise held that in order for a plaintiff to recover back pay, "*the jury must find* that the working conditions were so unpleasant" as to effect a constructive discharge. *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002) (emphasis added); *accord Alicea Rosado*, 562 F.2d at 119 ("Before a 'constructive discharge' may be found … the *trier of fact* must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (emphasis added). And the Seventh Circuit has held that a district court could not award back pay when "constructive discharge had not been submitted to the jury or proven," even though the evidence "may well have convinced a jury that [the plaintiff was] constructively

discharged" had it been asked to decide the issue. *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 657, 661 (7th Cir. 2001).

Nor can Bennett contend that the trial record establishes constructive discharge as a matter of law. To begin with, Bennett never moved for judgment as a matter of law on the issue of constructive discharge before or at trial. Even after the trial, Bennett never claimed that her evidence demonstrated a constructive discharge; she instead argued only that proof of constructive discharge is not required for an award of front or back pay. *See* Dkt. No. 216 at 27-28. In any event, even if the jury *could* have found constructive discharge based on the evidence presented at trial, it certainly was not *compelled* to do so. That is especially so if the vandalism incident is set aside due to the lack of evidence to impute it to CSXT, since the other incidents Bennett complains of plainly do not create conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado*, 562 F.2d at 119. Because Bennett failed to obtain a finding of constructive discharge in this case, the district court's award of front and back pay must be reversed.

**B.    The Awards Of Front And Back Pay Are Excessive.**

    **1.    The district court exceeded its discretion in awarding twenty-seven years of front pay at full salary.**

Even if some award of front pay is permissible, the district court's decision to award Bennett *27 years* of front pay at *full salary*, for a total award of $592,869, far exceeds what the law permits.  Indeed, it is unprecedented in a case in which the plaintiff has the potential to find work elsewhere.  The district court arrived at that amount by uncritically adopting the economic-loss estimate offered by Bennett's forensic economist, even though he admitted to problems with his calculation, which relied on assumptions that Bennett's other witnesses rejected.  By issuing a front-pay award that is both legally excessive and unsupported by the evidence, the district court abused its discretion.

    **a.    The front-pay award is legally excessive.**

This Court has repeatedly admonished that any front-pay award must be carefully "tempered" to avoid "'the potential for windfall' to the plaintiff." *Nichols*, 251 F.3d at 504 (quoting *Duke*, 928 F.2d at 1424). The front-pay award here is a quintessential windfall.  Despite the evidence that Bennett currently operates three other profitable

59

businesses, and despite her own witnesses' testimony that she will be able to increase her work responsibilities over time, the district court awarded her the equivalent of her full conductor salary for the rest of her employable life—on top of the jury's generous compensatory-damages award *and* nearly $100,000 in back pay.

The front-pay award also is irreconcilable with this Court's admonition that "front pay from the date of termination until [the plaintiff's] planned retirement [is] simply too speculative to award." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009). *Dotson* held that a plaintiff's request for 15 years of front pay was "unduly speculative" (*id.*), and other courts have rejected as excessive front-pay awards for as little as five years (*see, e.g.*, *EEOC v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir. 1998)). Yet the district court here awarded Bennett *27 years* of front pay based on nothing more than "plaintiff's testimony regarding her intended length of employment with defendant" (JA147)—even though the undisputed evidence was that Bennett has never worked for *any* employer other than herself for longer than five years (JA500).

The record in this case supports no more than a nominal amount of front pay. Significantly, the lengthy 44-month back-pay period already gave Bennett nearly four years to get back on her feet and to find new employment. *Cf. Nichols*, 251 F.3d at 504 n.3 (denying front pay where plaintiff received back pay). Bennett's brief employment with CSXT also makes a substantial front-pay award improper: Because Bennett worked at CSXT for a mere *two months* before leaving, there was no ground to conclude that she would have remained at her job for an extended period in the absence of discrimination. *See, e.g.*, *Peyton v. DiMario*, 287 F.3d 1121, 1129 (D.C. Cir. 2002) (reducing front-pay award for plaintiff who had worked for little more than a month); *HBE Corp.*, 135 F.3d at 555 (reducing front-pay award for plaintiff who had worked for only five months). On this record, it was therefore an abuse of discretion for the district court to award *any* non-nominal amount of front pay.

> **b.      The front-pay award is unsupported by, and directly contrary to, the evidence at trial.**

The district court also abused its discretion by uncritically adopting an economic-loss projection that was unsupported by—indeed contrary to—the evidence. The witness who presented that projection,

Dr. Wood, testified that his calculations assumed that Bennett is "a hundred percent unemployable … [f]or the rest of her adult life" and will "never earn another dime." JA501. He therefore estimated Bennett's economic loss by calculating her projected earnings for working as a conductor for the next 27 years, without any deduction for mitigating income. The assumptions supporting that calculation are flatly inconsistent with the undisputed evidence in this case.

Wood testified that he based these assumptions on information provided by Bennett's vocational rehabilitation expert, Dr. Vander Kolk. JA501. But Vander Kolk *rejected* the notion that Bennett is completely or permanently disabled. He testified that Bennett would be ready to return to work "sometime after a year, if everything goes right for her" (JA462), and he agreed on cross-examination that she "could get back in the work world perhaps after a year or maybe one to five years" (JA463-64). Vander Kolk further conceded, when confronted with evidence of Bennett's day-care and remodeling businesses, that she was already "on the edge" of "[t]he work world" at the time of the trial. JA464. When asked about this testimony, Wood conceded that his loss calculation

would change if his prior understanding of Vander Kolk's conclusion was incorrect.  JA501.

Wood's assumption that Bennett is permanently and completely disabled, such that she will never earn another dime, was also contradicted by Bennett's W-2 forms, which document that after she left CSXT, Bennett earned $19,335 in 2009 and $13,603 in 2010 through her day-care, catering, and remodeling businesses.  JA487, 489.  Wood conceded that these amounts had to be deducted from any back-pay calculation (JA495), yet he failed to include any similar offset in his front-pay calculation (JA495-96; *see* JA1002-03).  That was clear error.

Wood's assumptions are even at odds with the representations of Bennett's counsel.  Following the jury's verdict, counsel for Bennett stated in a letter to CSXT that "[b]ecause reinstatement is a potential remedy, I want to make sure CSX is prepared to reintroduce Vicky to its workforce" and asked "what steps are being taken and who will be responsible for her potential return to work."  JA126.  CSXT had no opportunity to respond to that letter before Bennett filed her motion for equitable remedies just three days later (Dkt. Nos. 198-199).  Because front pay may be awarded only "to complement a deferred order of

63

reinstatement or to bridge a time when the court concludes the plaintiff is reasonably likely to obtain other employment" (*Duke*, 928 F.3d at 1424), Bennett's representation through counsel that she is capable of returning to work rebuts the premise underlying the breathtaking award of front pay.

In short, Dr. Wood's economic-loss calculation was irreconcilably at odds with all evidence in this case. The district court's uncritical adoption of that facially flawed calculation was a clear abuse of discretion.

## 2. The district court miscalculated the amount of back pay.

The district court' also contravened this Court's precedents by including in its back-pay award an amount for "loss of personal services," which are encompassed in the jury's damages award, and by awarding Bennett back pay for a 20-month period when her entire training class was furloughed without pay.

### a. Bennett is not entitled to back pay for loss of personal services.

A district court may award front and back pay only to make up for lost wages resulting from a wrongful discharge. *See, e.g.*, *Duke*, 928 F.2d at 1423 (front pay is measured as "loss of future income," "loss of

future pay and benefits," or "[f]uture wages"); *Taylor v. Home Ins. Co.*, 777 F.2d 849, 858 (4th Cir. 1985) (upholding jury instructions defining "back pay" as "economic employment related losses" in the form of "normal salary and benefits and expectations of … employment"). Back pay is not available to cover damages caused by the harassment itself, which are instead part of the jury's compensatory award. Because the "loss of personal services" Bennett allegedly suffered (*i.e.*, being unable to perform her own household chores) is not a form of lost wages or benefits, and purportedly stemmed from the trauma of her car being vandalized rather than from the loss of her job, it may not be included in the Court's award of back pay.

### b.   Bennett is not entitled to back pay for the time her training class was furloughed.

The district court also erred in awarding back pay for the entire 44 months prior to trial even though Bennett's training class was furloughed without pay for 20 months of that time. Bennett's own damages expert conceded that his calculation should be reduced to account for the furlough (*see* JA507), but the district court neglected to do so.

65

"The goal of back pay is to make the victim of discrimination whole and restore him to the position that he would have occupied in the absence of the unlawful discrimination." *Blackburn v. Martin,* 982 F.2d 125, 129 (4th Cir. 1992). Here, the back-pay award did not return Bennett to the position she would have been in had she remained in CSXT's employ; instead, it impermissibly *overcompensated* her by making her *better off* than fellow employees in her training class who continued with the railroad. In *Blackburn*, this Court held that the plaintiff was not entitled to back pay for the period after other workers on his project were let go. *See* 982 F.2d at 129. Likewise here, Bennett is not entitled to recover lost wages for a period when her peers received no pay.[13]

### c. The back-pay award must be reduced to account for Bennett's ability to earn mitigating income in 2011 and 2012.

Dr. Wood's estimate of Bennett's pre-trial loss, which the district court adopted as its back-pay calculation, included offsets of $19,335 in

---

[13] The district court cited *Sloas v. CSX Transportation, Inc.*, 616 F.3d 380 (4th Cir. 2010), as support for its contrary conclusion. JA71, 147. But *Sloas* addressed only whether income from a collateral source should be offset against the back-pay award, which has no bearing on the issue here.

2009 and $13,603 in 2010 to account for mitigating income Bennett made through other employment.  JA1001; *see also* JA487, 489.  But no corresponding deduction was made for 2011 or 2012.  JA1001.  Woods conceded on cross-examination that he subtracted no mitigating income in 2011 and 2012 not because Bennett was *unable* to earn other income, or even because she *did not earn* other income, but instead because he *did not know* how much income she made in those years.  JA495, 496.  Given Bennett's sizable earnings in 2009 and 2010, however, the only reasonable inference is that Bennett was capable of earning comparable amounts of mitigating income in 2011 and 2012.  The district court therefore erred when it awarded back pay for those years without deducting an amount reflecting Bennett's duty and proven ability to mitigate her damages.

## IV. THE AWARDS OF ATTORNEYS' FEES AND COSTS SHOULD BE VACATED.

Should this Court reverse or vacate any part of the judgment below, it must also vacate the order awarding attorneys' fees and costs. If the Court deems the evidence insufficient to support liability or orders a new trial, Bennett will no longer qualify as a "prevailing party" eligible for attorneys' fees under 42 U.S.C. § 2000e-5(k) or costs under

Federal Rule of Civil Procedure 54(d). But even if the Court only reduces the amount of front pay and back pay, the district court will need to reconsider its fee award.

In its opposition to Bennett's request for attorneys' fees and costs, CSXT argued that the fee request must be denied, or at least substantially reduced, because Bennett unreasonably rejected CSXT's offer to settle her claims for an amount that was more than 2½ times the damages award she ultimately received from the jury. *See* Dkt. No. 203 at 5-6; Dkt. No. 207 at 11. The district court concluded that Bennett's rejection of the settlement offer was not unreasonable in light of the results she obtained, but only because "the jury award *combined with the Court's award of front and back pay*" exceeded the amount of the settlement offer. JA133 (emphasis added). A reduction in the amount of front pay and back pay would invalidate this key premise of the district court's fee order, and the case accordingly would need to be remanded with instructions to adjust the fee award in light of this Court's decision.[14]

---

[14] If this Court determines that Bennett is not eligible for an award of front and back pay, for example, she will have extended this litigation for years only to obtain a verdict worth less than two-fifths of what she

## CONCLUSION

The Court should vacate the judgment below and remand with instructions to enter judgment as a matter of law for CSXT. In the alternative, the Court should order a new trial. Failing that, the Court should reverse the award of front and back pay or, at minimum, order that it be reduced to an amount supported by the evidence. If the judgment is vacated or modified, the Court should also vacate the order awarding attorneys' fees and costs.

## REQUEST FOR ORAL ARGUMENT

This case implicates a range of important, recurring legal issues. Those issues relate to the standard for proving a hostile work environment, the exclusion of evidence of prior conduct, the admissibility of expert testimony, and the availability and permissible amount of front and back pay. Because affirming the judgment would require this Court to renounce its precedents and create a conflict with decisions of other circuits, CSXT submits that oral argument is plainly warranted.

---

was offered in settlement. The decision to continue litigating would have been plainly unreasonable, and Bennett's counsel should not be entitled to recover fees and costs incurred after the date of CSXT's settlement offer.

Dated: April 26, 2013                          Respectfully submitted,

_/s/ Miriam R. Nemetz_

Scott S. Cairns              John C. Millberg              Evan M. Tager
MCGUIRE WOODS LLP            Meredith E. Woods             Miriam R. Nemetz
Bank of America Tower        MILLBERG GORDON               Scott M. Noveck
50 North Street,                STEWART PLLC               MAYER BROWN LLP
   Suite 3300                1101 Haynes Street,           1999 K Street, N.W.
Jacksonville, FL 32202          Suite 104                  Washington, DC 20006
(904) 798-3323               Raleigh, NC 27604             (202) 263-3000
                             (919) 836-0090

*Attorneys for Defendant-Appellant*
*CSX Transportation, Incorporated*

70

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. _12-2477 / 12-2556_  Caption: _Vicky T. Bennett v. CSX Transportation, Inc._

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because:

☒ this brief contains _13,994_ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains ____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using _Microsoft Word 2007_ [*identify word processing program*] in _14-point Century Schoolbook_ [*identify font size and type style*]; **or**

☐ this brief has been prepared in a monospaced spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Miriam T. Nemetz _____

Attorney for _CSX Transportation, Inc._ _____

Dated: _April 26, 2013_ _____

71

## CERTIFICATE OF SERVICE

I certify that on this 26th day of April, 2013, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Miriam R. Nemetz*
Miriam R. Nemetz
*Counsel for Defendant-Appellant*
*CSX Transportation, Incorporated*